**BUFFALO COURIER–EXPRESS, INC., Plaintiff,**

v.

**BUFFALO EVENING NEWS, INC., Defendant.**

**No. CIV 77–582.**

United States District Court, W. D. New York.

Nov. 9, 1977.

Furth, Fahrner & Wong by Frederick P. Furth, Kirk A. McKinney, Daniel S. Mason, San Francisco, Cal., Falk, Siemer, Glick, Tuppen & Maloney by Charles D. Tuppen, Jr., Buffalo, N. Y., for plaintiff.

Munger, Tolles & Rickershauser by Ronald L. Olson, Allen M. Katz, Los Angeles, Cal., Jaeckle, Fleischmann & Mugel by Manly Fleischmann, John H. Stenger, Buffalo, N. Y., for defendant.

BRIEANT, District Judge.*

This action was filed in this Court on October 28, 1977. By its complaint, in which a jury trial is demanded, plaintiff seeks the following ultimate and preliminary relief (pp. 9, 10, 11):

"A. A declaration that defendant has violated Section 2 of the Sherman Act.

B. An Order preliminarily and permanently enjoining defendant from continuing to violate Section 2 of the Sherman Act by means of the acts alleged herein or by any other means which would prevent plaintiff from fairly competing in the trade and commerce of the publication of a daily metropolitan newspaper in Buffalo, New York.

C. An Order preliminarily and permanently enjoining defendant, its agent, servants, officers, employees, attorneys and all persons acting in concert with it from:

1. Distributing any editions of the Buffalo Evening News for no charge.

2. Distributing any editions of the Buffalo Evening News to any person who has not placed an order therefor.

3. Selling the Buffalo Evening News to any person at an unreasonably low price.

4. Setting its advertisement rates at an unreasonably low level.

5. Encouraging either implicitly or explicitly newscarriers, district managers or distributors of the Courier Express from leaving the Courier Express in favor of the Evening News.

6. Publishing disparaging remarks of and concerning the Courier Express to any person.

7. Sponsoring any contest violative of New York State law.

8. Undertaking any act, practice or scheme, the purpose of which is to eliminate the Courier Express as a competitor in the trade and commerce of the publication of a metropolitan daily newspaper in the City of Buffalo.

D. Damages in the amount proven at trial, and trebled as provided by law, together with costs and a reasonable attorney's fee, pursuant to section 4 and 16 of the Clayton Act.

E. Such other and further relief as the Court may deem just and proper."

The Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 1, 2, 5 and 15; and 28 U.S.C. § 1331.

Simultaneously with the filing of the complaint, and by Order to Show Cause signed on October 28, 1977 by Chief Judge Curtin of this Court, plaintiff sought a preliminary injunction restraining defendant, pending trial:

* Of the Southern District of New York, sitting by designation.

"A. From continuing to violate Section 2 of the Sherman Act by means of the acts alleged herein or by other means which would prevent plaintiff from fairly competing in the trade and commerce of the publication of a daily metropolitan newspaper in Buffalo, New York.

B. From distributing any edition of the Buffalo Evening News for no charge.

C. From distributing any edition of the Buffalo Evening News to any person who has not placed an order therefore.

D. From selling the Buffalo Evening News to any person at an unreasonably low price.

E. From setting its advertisement rates at an unreasonably low level.

F. From encouraging either implicitly or explicitly newscarriers, district managers or distributors of the Courier-Express from leaving the Courier-Express in favor of the Evening News.

G. From publishing disparaging remarks of and concerning the Courier-Express to any person.

H. From sponsoring any contest violative of New York State law.

I. From undertaking any act, practice or scheme the purpose of which is to eliminate the Courier-Express as a competitor in the trade and commerce of the publication of a metropolitan daily newspaper in the City of Buffalo."

An evidentiary hearing has been held, and the parties have also stipulated, solely for the purposes of this motion, and without conceding relevancy, some 28 separate agreed facts, with certain documents incorporated therein by reference. Familiarity with those agreed facts is assumed, and they will not be repeated below.

*The Parties*

Plaintiff is a New York corporation which is and has been for more than half a century, the publisher in Buffalo, New York, of a daily morning metropolitan newspaper, the "Courier-Express," hereinafter referred to as the "Courier." Reference herein to the Courier will also include the publishing corporation, or plaintiff, where the context so indicates.

Defendant is a New York corporation which is, and has been since April 15, 1977, publisher of a daily (except Sunday) afternoon metropolitan newspaper, the "Buffalo Evening News," hereinafter referred to as the "Evening News;" such reference also will include the defendant corporation as an entity, where the context so indicates. As discussed below, defendant acquired the assets, name and good-will of the Evening News by purchase from a business of the same name which had operated the paper since 1881.

*The Verified Complaint*

As amplified by the affidavit of Mr. Richard D. Lyons, Jr., the Courier's Secretary-Treasurer, sworn to October 28, 1977, and filed in support of this motion for a preliminary injunction, the complaint asserts in brief that both newspapers are engaged in interstate commerce, and that the acts complained of affect interstate commerce. After pleading the relevant market, discussed below, plaintiff charges that defendant, and others not sued, have conspired together to eliminate all competition in the publication of daily metropolitan newspapers in the Greater Buffalo, New York geographic market, and, by predatory means, to eliminate plaintiff's Sunday paper from the market, and thereby, because plaintiff is dependent on the profits of its Sunday paper to keep its daily paper alive, effect and create a monopoly.

Plaintiff charges a conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and also charges defendant with an unlawful attempt to monopolize (individually, and without regard to any allegations of conspiracy) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. It was on this latter claim that the motion for a preliminary injunction was based.

## Historical Background

About 50 years ago, the Evening News ceased to publish a Sunday paper. It sells its daily afternoon paper for 15 cents except on Saturday afternoon, when it sells its "Week-End" edition for 30 cents, containing most of the special features and supplements; including comics in color, commonly associated with a Sunday paper of general interest. It is and has been a six-days per week operation, and does not publish on significant holidays.

The Courier at all relevant times has published a daily morning paper, and a Sunday morning paper. It is a seven-day operation, and sells its week-day paper for 15 cents and its Sunday paper at 50 cents.

The circulation and advertising revenue of the Evening News has, for a long time, exceeded that of the Courier by substantial amounts, with only slight variation from year to year. Not only is the Evening News advertising revenue much greater than that of the Courier, but its total advertising linage has also substantially exceeded that of the Courier in recent years, notwithstanding the linage generated by the Courier on Sunday, when it is the only paper published. See Statement of Agreed Facts, and Schedules attached thereto for the precise figures and mathematical relationships. Whether judged on advertising linage, advertising revenue or circulation, the Evening News clearly emerges as Greater Buffalo's dominant newspaper of general circulation, and has been such for more than ten years. The circulation and total revenue of its Saturday afternoon (Week-End Edition) paper exceed those of the Sunday Courier.

According to its May 5, 1977 solicitation letter to advertisers, the Evening News covered with its daily edition 58%, and with its Week-End Edition 61%, of the 471,515 households located in the relevant "Audit Bureau of Circulation City and Retail Trading Zone," compared with 24% of these households covered by the weekday Courier and 53% by the Sunday Courier. This geographic area (See Ex. 1, p. 4 attached to Stipulation of Agreed Facts) includes all of Erie, Niagara, Orleans, Genesee and Wyoming Counties, and parts of Cattaraugus and Chatauqua Counties. In "Buffalo City and Suburbs" the Evening News coverage was somewhat greater.

Whether the existing disparity is accounted for by a preference for evening papers over morning papers, or because the Evening News is "a better paper" or a better managed paper, cannot be determined on this record. Suffice it to say that the papers do differ in content and style, and in their treatment of local and national news, and express different philosophical approaches to the great issues of the times.

## Mr. Buffett Comes to Buffalo

Mr. Warren E. Buffett, who testified, is the controlling shareholder, a director, and Chairman of the Executive Committee of Blue Chip Stamps, a publicly owned trading stamp company, which has been immortalized by Mr. Justice Rehnquist [*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)].[1] Mr. Buffett resides in Omaha, Nebraska, and is independently wealthy, apart from the substantial net worth of Blue Chip Stamps. He has considerable knowledge of the newspaper field. Since 1969, he has been Chairman of the Board of Directors of the publisher of eight associated weekly newspapers distributed in and around his home community.

Mr. Buffett, age 46, is also Chairman of the Finance Committee of the Washington Post Company, which publishes a newspaper of the same name, as well as Newsweek magazine and the Trenton [N.J.] Times. His interests in the newspaper business are both financial and journalistic.

Sometime early in 1976 a stockbroker, apparently not acting for plaintiff, told Mr. Buffett that "there might be some stock in the Courier-Express for sale" (Tr. p. 26).

---

1. Mr. Buffett acquired his Blue Chip stock long after the events mentioned in that litigation. See Plaintiff's Exhibit 3.

That possibility caused him to accumulate "knowledge of the Buffalo market" over a six or seven month period in that year, during which he looked at the relative positions of the two newspapers, their respective papers, circulation and advertising figures (Tr. p. 26). He declined interest in Courier stock, but concluded as a result of his study, that, in his words, "the Buffalo Evening News looked much the better property." For his reasons, see generally Tr. p. 26, *et seq.* How much Courier stock was offered, by whom, and at what price, did not come out at the hearing, but Mr. Buffett looked at the Courier just enough to know that he didn't want it, and would rather have the Evening News.

Opportunity came soon thereafter. A lawyer representing the Estate of Mrs. Edward H. Butler, deceased principal shareholder of the Evening News, offered to sell him the newspaper assets of the Evening News, retaining its non-newspaper, radio and television assets for disposition elsewhere. In reaching his decision to buy, Mr. Buffett was in possession of the comparable circulation and advertising linage and revenues of both papers, and the recent operating results and financial statements of the Evening News, as well as the demographic and Audit Bureau of Circulation data concerning the Greater Buffalo area and the relative position of the Evening News and other newspapers therein. He also had some information as a result of the prior presentation made to him with respect to Courier stock.

It is noteworthy, for reasons discussed below (p. 33), that Mr. Buffett, prior to reaching agreement to purchase (actually reduced to writing on February 7, 1977), never visited the plant of the Buffalo Evening News, and never met with or spoke to any of its editorial or financial personnel who were shortly to become his employees. He agreed to have Blue Chip Stamps purchase all the stock of a new corporation for approximately Thirty-Three Million Dollars, including adjustments for working capital and prepaid items. That corporation in turn purchased the newspaper assets of the corporation which formerly owned the Buffalo Evening News, and also agreed to assume approximately Four Million Dollars in underfunded retirement plan expense for Evening News employees. Blue Chip Stamps guaranteed performance by its subsidiary, defendant in this action.

Control of the Evening News passed to defendant, and thereby to Blue Chip Stamps, and Mr. Buffett, effective at closing of title on April 15, 1977.

*New Ownership Brings New Policy*

Even prior to purchase of the Evening News, it was apparent to Mr. Buffett, as well as to Blue Chip Stamps (such knowledge being imputed to defendant), that his paper, as the strongest in Greater Buffalo, was following an outmoded practice in publishing only six days per week, leaving the lucrative Sunday trade to the Courier. He believed, correctly, that "news happens seven days a week," and that accordingly a metropolitan newspaper should publish daily, if it is to serve its readership and advertisers (most of whom sell seven days a week) and prevent inroads from television or other non-print media which operate continuously. Buffett also perceived immediately the comparative weakness of the Courier, and that it was enjoying what he regarded as a monopoly of the market on Sunday. Not lost upon him was the fact that the economic value of the Evening News to its owner, if it were located in a single newspaper community, would be greatly enhanced, as much as three times over.

Since the economic and journalistic benefits that would flow to the Evening News were obvious to Buffett and his colleagues (See Buffett affidavit, ¶¶ 5 and 6), the decision to publish on Sunday was soon forthcoming. Having been a very successful entrepreneur in many fields, Mr. Buffett has faith in his own business judgment, and is not given to extensive analysis in depth, nor to reliance on formal projections of cost/benefit relationships made by others. In ¶ 8 of his affidavit, sworn to November 3, 1977, and treated, for the hearing, as part of his direct testimony, he testified:

"In moving toward the decision to publish seven days a week, no formal studies or analyses were made by me or the News management. In effect, the decision was so obvious on rough analysis that no formal projections were made."

This method or approach is probably not unwarranted. I find that Mr. Buffett reached the decision to proceed with seven day publication in just the manner above stated, and I regard the estimates or projections set forth at the hearing as something arrived at after the litigation, with the litigation and its implications in view, in order to justify the proposed advertising rates and newsstand prices that plaintiff regards as predatory.

The Evening News has decided to cease publishing the present Week-End Edition on Saturday afternoon. This Edition is, in appearance and content, much like an ordinary Sunday paper. Instead it will publish on Saturday *mornings* a daily paper comparable to its weekday afternoon paper. Of course, that edition will contain only a half-day's news, arising from events after the closing of the Friday evening edition. On Sunday *mornings,* the Evening News will publish a typical Sunday metropolitan paper with all the usual additional features, comics, rotogravure, weekly TV section and other usual items.

The Evening News proposes to sell its new Saturday morning paper for 15 cents (compared to 30 cents for the discontinued Week-End Edition, and 15 cents for the Saturday morning Courier), and to sell its new Sunday morning paper for 30 cents (compared with 30 cents for the discontinued Week-End Edition, and 50 cents for the Sunday Courier). Weekly rates are now, and will continue to be, equal to the sum of daily rates without discount. Under the former system of publishing only six days out of seven, the weekly rate was $1.05; under the proposed system the rate is to be increased by 15 cents (the price of the new Saturday morning edition) to $1.20. The effect on the case of existing six month and one year subscriptions is *de minimis.*

Before the new rates become effective, however, the Evening News proposes a five-week introductory program, discussed below.

The decision of the Evening News to publish on Saturday morning and Sunday morning, instead of publishing a Week-End Edition on Saturday evening, and nothing on Sunday, is a reasonable action, standing alone. Plaintiff does not claim otherwise, and disclaims any intention to seek to have this Court interfere in the decision to replace the single Week-End Edition with two separate morning weekend editions. The Courier's challenge is directed only towards what it regards as "predatory pricing" of the new papers, the claimed predatory effect of the proposed "Five Week Introductory Offer," and the claimed activities of the Evening News infelicitously referred to as "Disparagement," described below.

Defendant has the right to publish a Sunday paper, and a Saturday morning paper. It is in the public interest that it do so.

*Relevant Market*

■ The geographic market for our purposes may best be described as being that of the Audit Bureau of Circulation City and Retail Trading Zone discussed *supra,* pp. 7–8. That geographic area is commonly called "the Greater Buffalo area." Except for the Niagara Gazette, published daily and Sunday in Niagara Falls, New York, and some slight penetration by Rochester papers, the Courier and Evening News are the only "metropolitan" papers (*i. e.,* those emphasizing state and national news) in the geographic market, in which they now compete. Both papers circulate beyond this area, and are read to some extent outside New York State, and even in Canada.

■ There is also a circulation market, consisting of those persons within the geographic market who desire to read a metropolitan newspaper of general interest. While we have noted that there are differences in style and treatment of news, and differences in philosophy between the two papers, both are sufficiently within the mainstream of the community so that if one

paper disappeared, the circulation market probably would not find the other paper so repugnant that it would refuse to buy. There is some part of the circulation market now which buys both weekday papers, and a very substantial part of the weekday Evening News readership buys the Sunday Courier. The two papers, under the unusual circumstances present in Greater Buffalo, are found to be in the same circulation market, in which they now compete.

■ There is an advertising market, consisting of those print advertisers who would seek to address newspaper readers in Greater Buffalo. Most such advertisers can, and many do, use the two papers interchangeably, and simultaneously, although some 500 national accounts are said to limit their advertising solely to the Evening News. I find that both papers are in the same advertising market.

Defendant (br. p. 26) concedes for purposes of this motion that "the relevant market is the daily metropolitan newspaper, not any given edition." Defendant also stated, however, that at trial, it would "attempt to show that the relevant market is considerably broader, including radio and television as well as newspapers." (*ibid*).

Plaintiff, on the other hand, posits, in effect three relevant markets, and argues that:

"The existence of the Sunday newspaper market as a sub-market separate and distinct from the weekday market is recognized in *United States v. Times Mirror Company*, 272 [274] F.Supp. 606 (C.D.Cal. 1967), *aff'd.* 390 U.S. 12 [712, 88 S.Ct. 1411, 20 L.Ed.2d 252] (1971)." (Plaintiff's Supplemental Memorandum, p. 8).

" 'Within the daily newspaper market, there are three sub-markets; the morning newspaper, the evening newspaper and the Sunday newspaper. . . . Little need be said as to why the Sunday newspaper is a sub-market. Any reader recognizes the difference in price, style and content with special Sunday features and supplements. The newspaper industry by its publications recognizes the separate category.' 274 F.Supp. at 617.

"By defendant's own admission, it enjoys a dominant market position in the Greater Buffalo area for the daily market. "Defendant's Announced Plans To Employ Its Dominant Share Of The Monday-Saturday Market To Gain An Unfair Competitive Advantage In The Sunday Sub-Market Vioiates Section 2 Of The Sherman Act." (Plaintiff's Supplemental Memorandum, p. 12).

By its suggested analysis, which treats morning weekday papers as one sub-market (monopolized now by the Courier), evening papers as another sub-market (monopolized now by the Evening News) and Sunday as still another sub-market (monopolized now by the Courier), plaintiff seeks to bring itself within the line of cases such as *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), and *Foremost International Tours, Inc. v. Qantas Airways, Ltd.*, 379 F.Supp. 88 (D.Haw.1974), *aff'd.*, 525 F.2d 281 (9th Cir. 1976), which appears to condemn as a *per se* violation of the Sherman Act, any use of monopoly power in one market as a basis, or leverage to acquire competitive advantage in another market.

Our resolution of this motion is probably not dependent on whether we accept such analysis. However, on the basis of what appears in the record so far, there are no meaningful sub-markets in the newspaper industry in Greater Buffalo. The relevant market is that of metropolitan newspapers of general interest published in that geographic area. It is a small market in which the Courier and the Evening News are now, and have been, in competition for the patronage of the same readers and advertisers, and in which, historically, there have been no separately defined sub-markets, and in which the Evening News is now and has been the clearly dominant competitor.

If further evidence of the competitive dominance of the Evening News and the existence of a single market without compartments or sub-markets were needed, reference should be had to the historical trend of subscription prices. The price changes are shown on Exhibit 12. On each occasion

when there was a price increase for the daily paper, the companies acted almost simultaneously. One exception occurred in 1970 when the Courier undertook to exercise price leadership and increased its weekday morning and Sunday papers each by five cents. The Evening News waited for four or five weeks before raising its paper to the same price. During that period, some 20,000 readers, some 15% of the Courier's readership, were irreparably lost by the Courier to the Evening News, showing the fallacy, in Buffalo, of any suggestion that evening and morning papers are in meaningful separate and distinct sub-markets.[2]

*The Standard of Proof Which Plaintiff Must Meet to Obtain a Preliminary Injunction*

■ Statutory authority for the relief requested here is found in Section 16 of the Clayton Act, 15 U.S.C. § 26, which reads in relevant part as follows:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue."

To be entitled to any of the relief requested here, plaintiff must show "clear likelihood of success on the law *and the facts then available* . . . or sufficiently serious questions on the merits making them fair ground for litigation and a balance of the equities tipping decidedly in favor of preliminary relief." *Columbia Pic-*

*tures Indus., Inc. v. American Broadcasting Cos., Inc.,* 501 F.2d 894, 897 (2d Cir. 1974) (emphasis added). *See also, Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973). Such "serious questions" are generally considered to be those requiring litigation and "thus more serious investigation." *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953), *cited with approval* in *Columbia Pictures, supra.*

In *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1359 (2d Cir. 1976), the court in reversing a preliminary injunction in a private antitrust case brought solely under Section 1 of the Sherman Act, made clear that under either prong of the *Sonesta* test outlined above "a clear showing of the threat of irreparable harm . . . is a fundamental and traditional requirement of all preliminary injunctive relief."

"If the element of irreparable damage is prerequisite for relief where the plaintiff must show probable success on the merits, then *a fortiori* where the plaintiff establishes something less than probable success as to the merits, need for proof of the threat of irreparable damage is even more pronounced. In sum, the balancing of hardships test of *Sonesta* necessarily includes the showing of irreparable harm. In antitrust cases, the proposition requires no further elucidation since 15 U.S.C. § 26 explicitly requires for a preliminary injunction a showing 'that the danger of irreparable loss or damage is immediate,' and we have so held in a recent private antitrust case, *SCM Corp. v. Xerox Corp.,* 507 F.2d 358, 360 (2d Cir. 1974)."

■ Implicit also in any decision to grant or deny a preliminary injunction is a balancing of the hardships consequent on a grant or denial, and a consideration of its effect on the public interest. *See, Robert W. Stark, Jr., v. New York Stock Exchange,* 346 F.Supp. 217, 231 (S.D.N.Y.), *aff'd.* 466

---

**2.** That Mr. Buffett personally was unaware of this experience in 1970 is of no moment. All of the present local management knew about it, and their knowledge is imputed to the corporate defendant.

F.2d 743 (2d Cir. 1972). *See generally,* Mulligan, *Preliminary Injunction in the Second Circuit,* 43 Bklyn.L.Rev. 831, 836 (1977).

We discuss below the application of the foregoing standards to the facts now available in this case.

*Elements of Plaintiff's Claim for Violation of Section 2 of the Sherman Act*

Our analysis begins with the statute. Section 2 of the Sherman Act, 15 U.S.C. § 2, provides in relevant part as follows:

"§ 2. Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."

By § 15 of Title 15, a private cause of action is established in favor of "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."

■ An "attempt to monopolize" is defined as "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create the dangerous probability of it." *American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946). The party so charged must be shown to have committed these acts with the specific intent "to destroy competition or build monopoly." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). The competitor so

charged with an attempt to monopolize need not itself possess monopoly power, nor need it hold the dominant position in the market, although in this case I find the Evening News is dominant. *See, United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224–26 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *American Football League v. National Football League,* 205 F.Supp. 60, 64 (D.Md.1962), *aff'd.* 323 F.2d 124 (4th Cir. 1963).

■ For plaintiff to prevail on the ultimate trial of this lawsuit it will have to satisfy the trial jurors by a preponderance of credible evidence with respect to each of these elements: (1) that defendant attempted to monopolize, by driving the Courier from the relevant market; (2) that it used predatory, or commercially unfair means to do so, taking the totality of its conduct as a whole, rather than as isolated elements; (3) that it did so with specific intent; (4) that the totality of its conduct created a "dangerous probability" of monopolization; and (5) that plaintiff was damaged directly as a result.[3]

■ We now consider the proof readily available on this hearing with respect to each of these elements. Our function, we repeat, is not to decide these issues; that will be for the trial jury after all the proof is in. Rather, we must decide whether plaintiff now shows either a clear probability of success, as to each element, or that there are sufficient serious questions going to the merits to present fair ground for litigation. Before doing so, however, the Court notes that newspaper publishers, just as those engaged in any other trade, are regulated by the federal antitrust laws.[4]

---

**3.** For authority that defendant's conduct must include the use of predatory, commercially unfair means to accomplish the unlawful goal, *see Chisholm Bros. Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137 (9th Cir. 1974), *cert. denied* 419 U.S. 1023, 95 S.Ct. 1500, 42 L.Ed.2d 298 (1974); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 452 F.2d 579 (7th Cir. 1971), *cert. denied* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); *Union Leader Corp. v. Newspapers of New England, Inc.,* 180 F.Supp. 125 (D.Mass.1960), *modified,* 284

F.2d 582 (1st Cir. 1960), *cert. denied,* 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961).

**4.** *Associated Press v. United States,* 326 U.S. 1, 19–20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Lorain Journal Co. v. United States,* 342 U.S. 143, 155–56, 72 S.Ct. 181, 96 L.Ed. 162 (1951). Clearly, both newspapers in this case are engaged in interstate commerce. See the criteria in *Lorain Journal, supra; Associated Press, supra; Indiana Farmer's Guide Publishing Co. v.*

The First Amendment rights of the Evening News do not include the right to drive out its competitor by predatory business practices; nor do the First Amendment rights of the Courier insure its continued existence, if, as a result of fair competition in the market place, the readers and advertisers of Greater Buffalo conclude that they can get along with only one newspaper as their unregulated toll bridge to the events of the outside world.[5]

█ Arguments to the contrary, said to be based on the First Amendment, are unfounded. However, any order which enjoins particular activity in connection with a newspaper should be narrowly drawn "so as not to 'unwarrantedly abridge' acts normally comprehended within the first amendment." *Buckley v. American Federation of Television & Radio Artists*, 496 F.2d 305 (2d Cir. 1974), *cert. denied* 419 U.S. 1093, 95 S.Ct. 688, 42 L.Ed.2d 687 (1974), quoting *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). This is especially so when, as here, the relief requested, although not going directly to the freedom of the press "to print as and how one's reason or interests dictates," *Associated Press v. United States*, 326 U.S. 1, 20, n.18, 65 S.Ct. 1416, 1425, 89 L.Ed. 2013 (1945), might in effect restrain a temporarily wider possible dissemination of information.

*Defendant's Plans for Introducing its Sunday Paper*

On September 3, 1977 the Evening News announced that commencing with Sunday, November 13, 1977, it would terminate its Week-End Edition, and instead publish a Saturday morning paper, similar in format to its weekday evening papers, and a Sunday paper. Actually, under the plan as subsequently revealed, the change will take effect Saturday, November 12, 1977. The Evening News also announced that it would publish on holidays, contrary to past performance.

On October 27, 1977 (the day before this suit was filed) defendant announced publicly that it would introduce "seven-day publication home delivery at no increase in price" for the first five weeks of the introductory period. Exhibit 7, published in the Evening News on that date, also states:

> "Home delivery News carriers will include all present 6-day subscribers in the delivery of the Sunday News during the introductory period.
>
> PRESENT home delivery
> Monday through Saturday $1.05
>
> \* INTRODUCTORY home delivery
> Monday through SUNDAY $1.05
>
> > \* Following the introductory period, November 13 through December 11, home delivery will be $1.20 per week."

The Buffalo Evening News will continue to publish Monday through Friday in the afternoon, except for holidays. On holidays, Saturdays and Sundays, The News will publish mornings.

Single copy rates
Weekday--15¢ Sunday--30¢

The true substance of this advertisement is that subscribers already having the Evening News delivered six days per week will get the *Sunday* paper free. The purpose is to introduce the new and better product, namely the Sunday paper. At the hearing defendant persisted in the quibble that it was the new, abridged Saturday morning paper, to be sold on that day ultimately at 15 cents in lieu of the present Saturday afternoon "Week-End Edition," being discontinued, which was being given away. Since the Saturday morning paper will now be just like the evening weekday papers, little necessity exists for "introducing" it.

As to the Sunday paper, there is a legitimate business purpose to be served in intro-

---

*Prairie Farmer Publishing Co.*, 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356 (1934).

**5.** Mr. Buffett was described to the *Wall Street Journal* by an investment banker as follows: "Warren likens owning a monopoly or market dominant newspaper to owning an unregulated toll bridge. You have relative freedom to increase rates when and as much as you want." While he disputed the accuracy of the quotation, Mr. Buffett concedes that remark correctly reflects his philosophy. See, Tr. p. 50.

ducing it to the present six-day Evening News readers so they may compare it with the Sunday Courier and decide which product to choose after the introductory period.

While internal Evening News documents treat the "free" introductory offer as pertaining only to the Saturday paper, the "Notice to Newscarriers" dated October 12, 1977 (Exhibit C attached to the Lyons affidavit) discloses the true nature of the promotion:

"Dear NEWScarrier:

TWO IMPORTANT DATES
SATURDAY, NOVEMBER 12, 1977
SUNDAY, NOVEMBER 13, 1977

As previously announced, the Buffalo Evening News will begin publishing a Saturday and Sunday morning edition on the above dates. Monday through Friday afternoon delivery schedules will remain the same.

To avoid any misunderstandings about the amount of papers you should order for your customers for Saturday and Sunday mornings, let us assist you in this matter.

INCLUDE EVERY CUSTOMER IN YOUR SUNDAY MORNING DELIVERY THAT NOW RECEIVES THE NEWS MONDAY THROUGH SATURDAY.

EXAMPLE: If you have 50 customers Monday through Saturday, you should order 50 papers for your Sunday morning deliveries.

If you have customers that now receive the News each Saturday only, include those customers in each Sunday's deliveries also. Those Saturday only customers will become your SATURDAY AND SUNDAY only customers (more profit for you)."

As an integral part of the plan, defendant announced its post-introductory subscription prices, and continued in effect on Sunday its advertising rates for the Week-End Edition being discontinued. It then issued the following statement to present and potential advertisers (Exhibit D attached to the Lyons affidavit):

"NEW — IN BUFFALO

EFFECTIVE NOV. 13, 1977 . . .

BUFFALO EVENING NEWS

'GOES SUNDAY'.

280,000 Circulation Guaranteed
For A Minimum Of Four Weeks." (Underlining added).

The basis for making the "guaranty" referred to above is that the new *Sunday* paper will be "forced," *i. e.*, delivered without extra charge, to all existing subscription readers who previously have been taking the Week-End Edition. Such persons would also receive the new Saturday paper, but in its pitch to the advertisers the Evening News did not claim there was to be any "guaranty" of that circulation. The notice quoted explains and amplifies the true intention, to give away and "force" the Sunday paper for five weeks.

No disclosure was made to advertisers as to what would be done if the "280,000 Circulation Guaranteed" was not forthcoming. That figure apparently depends on making some newsstand and store sales at 30 cents, which probably will present no difficulty for the Evening News. Never before has the Evening News made any such "guaranty" to its advertisers; at most it stood committed to use its best efforts and made adjustments for advertisers only when events such as the "Blizzard of '77" substantially stopped its home delivery.

The Plan includes use of a readership contest and a general promotional budget during the transitional period, authorized by Mr. Buffett's letter of September 12, 1977 (Exhibit 6) as follows:

"5. Promotional budgets sound fine. As between dollars spent nationally to tell the world what we are doing and dollars spent in Buffalo to let the local citizens know, I much prefer the latter. Let's look around for contests involving reader involvement that has proven successful in other cities where a Sunday paper was being initiated—although our problem obviously is somewhat different where we simply are shifting a weekend edition."

At the hearing, no proof was offered as to the claimed illegality, under the New York State anti-gambling statutes, of the planned readership contest, although such an allegation is made in the pleadings.

Plaintiff did claim that the circulation rates, and the advertising rates were both so unreasonably low as to be predatory and unlawful as an attempt to monopolize, that the offer to provide "guaranteed" circulation to advertisers during the five week promotional period, the claimed attempt to "disparage," and the "blanketing" of free copies of the Sunday paper, or the "tie-in" sale thereof, singly or taken together, constituted conduct having a dangerous probability of monopolization.

*Defendant's Specific Intent to Monopolize*

I find that plaintiff, on this hearing, has shown a clear probability of success at trial on the issue of specific intent to monopolize. Here, we are not concerned solely with the knowledge and intent of Mr. Warren E. Buffett, although his intentions are certainly imputed to defendant. The intent of a corporate defendant is the totality of the intent of its officers, servants and agents.

Intent to monopolize need not be proven by direct evidence. Indeed, where, as here, no conspiracy need be proved, it would be highly unlikely to find any such direct evidence. Intent exists only in the unfathomable human mind. But actions speak louder than words. And persons, corporations too, are deemed to intend the natural and probable (or necessary and direct) consequences of their acts. While the traditional charge to that effect is no longer approved for juries in criminal trials in this Circuit, the rule remains applicable in civil antitrust cases. *Compare, United States v. Erb*, 543 F.2d 438 (2d Cir. 1976) *and United States v. Barash*, 365 F.2d 395 (2d Cir. 1966), *cert. denied* 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969) *with United States v. Griffith*, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948) *and United States v. Patten*, 226 U.S. 525, 543, 33 S.Ct. 141, 145, 57 L.Ed. 333 (1913), the last case holding that:

"And that there is no allegation of a specific intent to restrain such trade or commerce does not make against this conclusion, for, as is shown by prior decisions of this court, the conspirators must be held to have intended the necessary and direct consequences of their acts, and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result."

In this case, viewed in the light of the Evening News' present market dominance; the relative weakness of the Courier, and the dangerous probability of monopolization, which is inherent in the totality of the proposed promotional plan, and its apparent predatory aspect, discussed below, it is possible to infer specific intent to attempt to monopolize from the plan itself, against the known factual background, and applying the principle that an actor is deemed to intend the natural and probable consequences of his acts.

Also in this case, there is additional evidence of specific intent to monopolize found in the circumstances of the acquisition of the Evening News by Blue Chip Stamps, and from the testimony of Mr. Buffett at the hearing.

We have noted that Blue Chip Stamps bought the newspaper properties of the old Buffalo Evening News company last April 15th for approximately Thirty-Three Million Dollars, including working capital, all paid in cash. The deal was made without inspecting the physical plant or conferring with the personnel who would continue the operations for the new owner. However, the relative positions of the two competing papers was well known to Mr. Buffett, as was the data on comparative revenues, linage and circulation. Mr. Buffett made no secret of his economic motivations and his acute awareness of the value which would be attached to ownership of the Evening News were it to become a monopoly. But for the awareness of this likelihood, it

seems the acquisition of the Evening News for this price, all in cash, and in this manner, makes no economic sense. At least, the Courier has a strong likelihood of being able to show this on a plenary trial, when all relevant information will have been discovered.

When bought by Blue Chip Stamps, the Evening News already dominated about two-thirds of the market, and its outmoded Week-End Edition outsold the Courier's Sunday Paper. All other facts being equal, in fair Sunday competition with the Courier, the Evening News should expect to sell the same relative proportion of readership and advertising that it does during the week. Since everything in life is susceptible of improvement, perhaps under new leadership, the Evening News can increase its sales and revenues. But can it double its earnings, or triple them, while the Courier yet lives?

The economics of money suggest it would have to, in order to justify the investment. We accept for our analysis Mr. Buffett's contention that the additional Four Million Dollars committed *in futuro* by Blue Chip Stamps for accrued actuarial estimates of underfunded retirement benefits has no meaningful part in any economic analysis, and that the historical cost, or "book value" of the physical assets in sellers' hands is also meaningless. Also, future earnings can always be more, or less, than recent historical earnings.

Yet it remains so that a newspaper property regarded as the best in Buffalo, prior to its recent sale had the following operating earnings before income taxes (Exhibit 1, with interest excluded):

| 1974 | 1975 | 1976 | 3 Mos. Ending March 31, 1977 |
|------|------|------|------------------------------|
| $864,482.00 | $1,270,819.00 | $1,659,630.00 | Loss ($560,597.00) |

Banks in this District charge *prime* borrowers 7¾% annual interest. At prime rates, Thirty-Three Million Dollars would cost $2,557,500.00 per year. Equity money and greater risks would usually cost more. Can the foreseeable future income of the Evening News while the Courier yet lives justify an investment of 33 Million? Haply, a Western New York jury will not think so.

Mr. Buffett testified that (Tr. p. 166): "In the case of monopoly papers, I haven't bought any monopoly newspapers but I have observed the purchase of dozens. The price hovers right around three times gross revenues. That assumes there are no extraneous assets like television stations or something, just the newspaper assets. If the town has unusual prosperity prospects, they will bring slightly more than three times gross revenues. A standard town would bring about three times gross revenues. A competitive paper is an entirely different animal."

He went on to say that he had paid 80% of annual gross revenue to purchase the Evening News.[6]

### The Promotional Plan Taken as a Whole is Predatory

In their analysis of the "five week giveaway" or "blanketing" aspect of the plan, both sides lay stress upon, and interpret differently, the interesting case of *Morning Pioneer, Inc. v. Bismarck Tribune Company*, 493 F.2d 383 (8th Cir.), *cert. denied* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974), reported below in 342 F.Supp. 1138 (D.N.D.

---

**6.** The foregoing economic analysis may be somewhat simplistic. It omits possible factors not in this record, such as the advantageous cash flow and tax shelter from depreciation, assuming most of the purchase price is allocated to fixed depreciable assets the purchaser bought unseen. Also, defendant probably can file a consolidated federal income tax return with Blue Chip Stamps, and this may benefit either or both entities. Clearly, the inference in the text is not the only one possible and there may be additional explanations. But the nature of the purchase transaction itself is some evidence bearing on the probability of success at trial, which can be developed further during pre-trial discovery.

1972). This Court does not view that case in the same light as do the parties.

Giving free samples of newspapers, as of any consumer product, can be a reasonable and appropriate method of getting the purchaser acquainted with something new. When "blanketing" or free sampling, here to a defined group of persons already subscribing to the Evening News, takes place reasonably, innocently, and for a period, the duration of which is related to the goal of new-product introduction, it is a permissible form of competition. Where the blanketing is done to excess, and with a bad motive, to attempt to monopolize, it will lose its innocent character and become a commercially unfair and predatory practice. That is common sense and all we read from the *Pioneer* Case.

Here, coupled with that part of the promotion which offers "Guaranteed" circulation to the advertisers during the proposed five-week period, a particularly harmful scissors action was created with respect to the Courier's potential advertisers.

First, we note that the five week promotional period coincides with the busiest season in local advertising, when demand is the greatest, and the season in which newspapers in this market recoup losses during earlier, slower parts of the calendar year. Mr. Buffett testified, and I find, that total advertising expenditure and linage in a market with two competing papers is usually greater than when only one exists. Mr. Lyons testified and I find, that most advertisers prepare their budgets well in advance. This sudden blitz on advertisers, whereby they were offered five weeks *guaranteed* circulation as part of the Evening News promotional plan was so attractive that some advertisements already placed in the Sunday Courier have been cancelled, to be placed in the promotional issues of the Sunday News instead.

Significantly, no complaint is made of lost revenue in the Saturday morning Courier. Perhaps this explains defendant's insistence in this litigation that only its new Saturday paper is being given away free. The advertisers understand the situation— it's the Sunday paper which is guaranteed because it's free, and its circulation is forced.

The Evening News readership already knows the Week-End Edition of the paper, and most know the weekday product. As Mr. Buffett recognized (Exhibit 6, p. 2) ". . . our problem obviously is somewhat different where we simply are shifting a weekend edition" from "other cities where a Sunday paper was being initiated." [7]

To acquaint its readers with this new product, so they can decide whether on future Sundays, or Saturdays, to buy the Evening News, the Courier, or both papers, it would seem clear that one, or at most two free samplings would suffice. *Five*, as proposed, at the busiest, most profitable season, is clearly unreasonable. The true purpose is monopolistic, whether taken together with the "guaranty" made to the advertisers, or alone. As to this aspect of the plan, plaintiff shows a clear probability of success in proving at the trial that the intent and purpose was to attempt to monopolize and harm the Courier, and that it would do so.

Other aspects of the plan are challenged. It is said that a 30 cents price is unreasonably low for the Sunday edition. The Court cannot say that it is, at least not on this record. The question of the price presents at most fair ground for litigation. It is the price at which the current Week-End Edition is being sold. Most upstate Sunday papers sell for more, usually 50 cents.

In the context of the entire plan, the "guaranty" to advertisers, taken together with the five week give-away, as it must be, is a predatory action the purpose and effect of which is to attempt to monopolize.

Whether the advertising rates themselves, considered apart from the give-away

---

7. The order of this quotation is transposed for clarity. For the entire paragraph, see p. 640, *supra*.

**644**

and the guaranty, are unreasonably low is considered in the same light as the newsstand price of the new Sunday paper. It presents at most fair ground for litigation. Except for new rotogravure rates, the advertising rates proposed are basically those now in effect for the Week-End Edition.

*Disparagement*

There is no evidence that the Evening News has "disparaged" the Courier in any of its published articles, nor that it intends to do so.[8] It appears that many rumors of the immediate closing, failure, or possible bankruptcy of the Courier are abroad in the community and probably have come to the attention of advertisers, readers, employees and independent distributors of the Courier. There is no proof that Evening News top management caused dissemination of any such matters, or that it intends to do so.

Several unfortunate incidents have occurred, as set forth on the trial record, which need not be detailed here except to observe that the incidents were probably unauthorized, and may have occurred simply as a result of attempts at levity. Apparently the new ownership has created a competitive team spirit on the part of the Evening News employees, which has manifested itself in what appear to be *ultra vires* actions, which, added to what has already taken place, may tend to demoralize and damage the Courier. Whether or not the conduct complained of was authorized, principles of *respondeat superior* apply, and the Court will protect the Courier against raiding or an attack on its staff morale while this litigation continues.

*Dangerous Probability of Monopolization*

Our prior analysis shows that the advertising revenues of the next five weeks are historically of great significance. The Courier is dependent on its Sunday revenues for almost two-thirds of its total gross receipts. The promotional plan, with its guaranteed circulation and excessive free

blanketing on Sunday has already stamped-ed some of the Courier's advertising, previously contracted for and committed, but cancelled after defendant's actions detailed above.

There are only two newspapers now. If the plan works as I find it is intended to work, there will be but one left. This is apparent on the entire record before me.

The entire arsenal of anti-competitive tricks and devices need not be unlimbered to extinguish the Courier. While the Evening News owns its plant free and clear, and has the backing of Blue Chip Stamps, as well as Mr. Buffett, it appears that the Courier-Express enjoys no similar strength. Its operations have been of marginal profitability in recent years. It had newspaper operating income of $96,955.00 in 1976, although for the eight months ending August 31, 1976 it had lost $59,842.00 from newspaper operations. It lost money in 1975. It is clear that the fall and winter months make the difference between profit and loss. No business can continue long at a loss. It appears that the plaintiff shows a clear probability of success at trial with respect to the element of "dangerous probability."

*Irreparable Damage—No Adequate Remedy at Law*

Plaintiff has established that the continued existence of its newspaper is immediately threatened by plaintiff's promotional plan, and attempt to monopolize. Although the amount of damages may be subject to appraisal and trebling by our trial jury, and defendant has the wherewithal to pay such damages, such remedy is not necessarily adequate, and will not be adequate in the situation presently before the Court. The owners of the Courier want to continue to publish a newspaper, not "to live on the income from a damages award." *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir. 1970). *See also, Foremost Int'l Tours, Inc. v. Qantas Airways, Ltd.,* 379 F.Supp. 88, 97 (D.Haw. 1974), *aff'd.* 525 F.2d 281 (9th Cir. 1976).

---

**8.** Disparagement is defined in Webster's Third New International Dictionary as the "diminution of esteem or standing; the expression of a

low opinion of something: detraction; low opinion, contempt."

And it is none too clear that the value of plaintiff's business immediately prior to the tort is capable of calculation. One attempting such an appraisal would have to evaluate many imponderables, including the question of whether the Courier could long survive legitimate non-predatory competition by an improved version of the Evening News. Despite the broad latitude allowed plaintiffs in antitrust cases to establish damages, *see SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 363 (2d Cir. 1974), "the difficulty of ascertaining damages with certainty is a proper test of irreparable harm . . . ." *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976). *See also, Danielson v. Local 275, Laborers Int'l. Union*, 479 F.2d 1033, 1037 (2d Cir. 1973); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969).

Furthermore, a court of equity will look "to the nature of the right which is injuriously affected," *Revere Copper & Brass, Inc. v. Economy Sales Co.*, 127 F.Supp. 739, 742 (D.Conn.1954), in determining whether the claimed injury is in fact irreparable. Here, the right and property affected are unique. *See, Engine Specialties, Inc. v. Bombardier, Ltd.*, 454 F.2d 527, 531 (1st Cir. 1972).

Plaintiff here has made a clear showing that if appropriate injunctive relief requested is not granted, irreparable injury will result. *See, New York v. Nuclear Regulatory Commission*, 550 F.2d 745 at 750, 755 (2d Cir. 1977); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976).

*Balancing Equities*

 Although plaintiff has established an imminent threat of irreparable injury if an injunction is not forthcoming, the public interest must also be considered.[9] "Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian Ry. Co. v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

The public interest here favors continued competition, and the Evening News has the right to compete on Sundays and holidays. This Court's function is limited to an attempt, using its equitable powers, together with the deterrent factor of a treble damage jury verdict at some future time, to see that the Evening News fights according to the Marquis of Queensberry.

The ultimate decision will be made in the market place by the readers and advertisers, who will decide how many newspapers they want, or will support.[10] The antitrust

---

9. Congressional policy recognizes this fact. See § 2 of the Newspaper Preservation Act, 15 U.S.C. §§ 1801–04.

10. The foregoing discussion is not intended to suggest or imply that the Courier cannot survive in a fair fight in the market place. Were this clear, there will be little point in granting any equitable relief. Of some passing interest is the viewpoint expressed by a weekly paper published in the Greater Buffalo area:

"[S]pokesmen for the quality chains maintain that their newspapers are objective and fair. They claim that they don't try to force a single viewpoint down the throats of the public.

But the problem is not that simple.

When the Herald-Tribune died in New York City, the loss was not that the Republican counterpart of the Democratic New York Times had disappeared. And no-one suggested that the Times thenceforward would suppress certain types of news which had appeared in the Trib.

Rather, the loss was the loss of a journal with the style, the coloring, the approach, and the personality of the Tribune.

The tribune had been different, and it is the loss of that difference which is important. No matter how conscientious, how professional, or how skilled a single or monopoly ownership may be, it cannot synthetically supply the difference in tone and personality *not to mention ideology.*

\* \* \* \* \* \*

We would be saddened to see the Courier sink under competition. But we would feel no remorse if it didn't put up an honest fight, striving to improve quality. If it can't do that, then it deserves to sink, and one more voice—independent, filled with personality and tone and providing one more view on the world—will disappear."

[Quoted from the *Cheektowaga Examiner*, Nov. 3, 1977].

laws "were enacted for 'the protection of *competition*, not *competitors*.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), *quoting Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

█ For these reasons, and because of the First Amendment implications, the scope of the provisional remedy will be narrow. No detriment will flow to the Evening News. The only colorable claim of irreparable damage made by it, if injunctive relief were to be granted, is "loss of credibility" with the advertisers whom it has tortiously guaranteed, and loss arising from pre-printed rotogravure it has created for its give-away. The first argument has no force—businessmen understand the function of courts, and *force majeure* doesn't impair credibility. As to the second point, Equity will shape the remedy accordingly. The irreparable damage faced by the Courier if some relief is not granted is clear from the foregoing discussion. The Court finds that the injunctive relief set forth in its separate Order being filed herewith is the minimum necessary to protect plaintiff, and the public from irreparable damage.

█ In order to expedite whatever appellate proceedings may appear appropriate, the Court now declines to stay its Order pending appeal. See Rule 8(a), F.R. App.P.

Since some provisional relief is being granted by our Order signed today, and such relief is less than that requested, it appears that the interests of both parties and the public will be served by a prompt trial of this case. The parties are directed to go forward immediately with their pre-trial discovery. Should it appear appropriate, a United States Magistrate or a Special Master may be designated to supervise such pre-trial procedures, thereby avoiding delay, and assuring prompt resolution of any difficulties which might arise. If such a designation becomes desirable, it may be requested by letter in the first instance from the Chief Judge of this District.

Motion granted in part, and in part denied. An Order has been signed.