BUFFALO COURIER–EXPRESS, INC., Appellee,

v.

BUFFALO EVENING NEWS, INC., Appellant.

No. 518, Docket 77–7617.

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 1979.

Decided April 16, 1979.

Frederick P. Furth, San Francisco, Cal. (Furth, Fahrner & Wong, San Francisco, Cal., Daniel S. Mason and Joel Yodowitz, San Francisco, Cal., of counsel), Falk, Siemer, Glick, Tuppen & Maloney, Buffalo, N. Y. (Charles D. Tuppen, Jr., Buffalo, N. Y., of counsel), for appellee Buffalo Courier-Express, Inc.

Peter R. Taft, Los Angeles, Cal. (Munger, Tolles & Rickershauser, Los Angeles, Cal., Ernest J. Zack, Allen M. Katz, and Harold A. Barza, Los Angeles, Cal., of counsel), Ohlin, Damon, Morey, Sawyer & Moot, Buffalo, N. Y. (Richard E. Moot, James M. Kieffer and Christopher T. Greene, Buffalo, N. Y., of counsel), for appellant Buffalo Evening News, Inc.

Before FRIENDLY, SMITH and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal is from three orders of Judge Brieant, sitting by designation in the District Court for the Western District of New York, in a civil antitrust suit by Buffalo Courier-Express, Inc. (the Courier) against Buffalo Evening News, Inc. (the News). The Courier had been Buffalo's only weekday morning newspaper and only Sunday paper. The News had been Buffalo's only weekday evening paper; on Saturday evening it published a larger "weekend" paper which contained special features usual in Sunday papers.

This action by the Courier, alleging that the News had violated § 2 of the Sherman Act, was the result of a 1977 decision by the

News, under new ownership, to publish a competing Sunday paper. The News appeals from orders (1) granting a temporary injunction against certain tactics incident to this effort, 441 F.Supp. 628 (D.C.1977), (2) finding it guilty of one instance of civil contempt, and (3) denying its motion for modification of the injunction.

### I.

The News had been selling its Monday-Friday papers for 15¢ per copy and its Saturday weekend edition for 30¢, a total of $1.05 per week for a reader subscribing to all. The Courier sold its Monday–Saturday papers for 15 ¢ per copy and its Sunday paper for 50 ¢, a total of $1.40 for a reader subscribing to all. The News' Monday–Friday evening circulation had been slightly more than double the Courier's Monday–Saturday morning circulation in 1972–76[1] —for reasons which the judge was unable to determine.[2] In contrast the Courier's Sunday circulation was quite comparable to that of the Saturday weekend News.[3] The News had a lead of roughly 60-40 in advertising lineage for the same years;[4] in advertising revenues its lead was greater.[5]

The change in the News' policy was a result of its acquisition early in 1977 by

---

1. The figures were as follows:

| Year Ending September 30 | Courier | News | News Circulation as a Percentage of Courier Circulation |
|---|---|---|---|
| 1976 | 124,127 | 277,623 | 224% |
| 1975 | 123,179 | 277,105 | 225 |
| 1974 | 125,804 | 277,812 | 221 |
| 1973 | 127,955 | 278,332 | 218 |
| 1972 | 131,918 | 278,035 | 211 |

2. The more usual pattern is for morning papers to have greater or at least equal circulation.

3. The figures for 1972–76 were as follows:

| Year Ending September 30 | Sunday Courier | Saturday (Week-End) News | News Circulation as a Percentage of Courier Circulation |
|---|---|---|---|
| 1976 | 269,894 | 294,168 | 109% |
| 1975 | 267,348 | 293,471 | 110 |
| 1974 | 271,915 | 296,017 | 109 |
| 1973 | 287,271 | 297,455 | 104 |
| 1972 | 298,985 | 296,385 | 99 |

4. The figures were as follows:

| | Morning Courier | % | Sunday Courier | % |
|---|---|---|---|---|
| 1976 | 9,579,527 | 16.8 | 13,083,565 | 22.9 |
| 1975 | 9,799,630 | 17.2 | 12,760,654 | 22.4 |
| 1974 | 11,565,081 | 18.2 | 14,494.438 | 22.8 |
| 1973 | 12,335,890 | 18.7 | 14,642,587 | 22.1 |
| 1972 | 12,117,516 | 18.6 | 14,460,752 | 22.2 |

| | News | % |
|---|---|---|
| 1976 | 34,429,827 | 60.3 |
| 1975 | 34,325,012 | 60.3 |
| 1974 | 37,605,505 | 59.1 |
| 1973 | 39,100,867 | 59.2 |
| 1972 | 38,548,382 | 59.2 |

5. The figures were as follows:

| | Courier | News | News Advertising Revenue as a Percentage of Courier Advertising Revenues |
|---|---|---|---|
| 1976 | $16,341,180 | $28,464,730 | 174% |
| 1975 | $15,064,640 | $25,658,388 | 170% |
| 1974 | $14,461,339 | $23,983,198 | 166% |
| 1973 | $14,067,153 | $22,812,353 | 162% |
| 1972 | $13,147,128 | $21,275,000 | 162% |

Warren E. Buffett. Mr. Buffett, a resident of Omaha, Nebraska, is the controlling stockholder, a director, and Chairman of the Executive Committee of Blue Chip Stamps. Since 1969 he has been Chairman of the Board of Directors and the publisher of eight associated newspapers published in or around Omaha. He also is Chairman of the Finance Committee of the Washington Post Company, which published, in addition to the Post, Newsweek and the Trenton, N. J., Times, and has indirect ownership interests in the Boston Globe and several other media organizations. As a result of advice from a broker early in 1976 that some Courier stock might be for sale, Buffett spent some time studying the Buffalo newspaper market and concluded that "the Buffalo Evening News looked much the better property."

Shortly thereafter an agent representing the estate of the News' principal shareholder offered to sell Buffett the newspaper assets of the News. The purchase was effected by Blue Chip Stamps' contributing some $33 million for the stock of a new corporation which paid the same sum for the News' newspaper assets and agreed to assume underfunded employee retirement plan expenses, estimated at some $4 million.[6] The closing occurred on April 15, 1977.

Buffett decided, shortly after the purchase, on the basis of his media knowledge and expertise, that for both journalistic and business reasons the News should move into the Sunday market. The Courier does not assert that this decision was in any way violative of § 2; indeed, such action was manifestly pro-competitive. A disinterested commentator has written that "the con-

sensus seems to be that a newspaper without a Sunday edition cannot hope to compete successfully against one that does have a Sunday edition." Roberts, Antitrust Problems in the Newspaper Industry, 82 Harv.L.Rev. 319, 349 (1968).

The method chosen for the News' entry into the Sunday market was to replace the former Saturday evening "weekend" paper with a "thin" Saturday morning paper, which necessarily would be limited to news occurring after the Friday evening paper had gone to press, and to publish a typical Sunday morning paper with the usual additional features, such as comics, rotogravure, and a weekly TV section. The Sunday edition was to sell for the same 30¢ as had the discontinued Saturday evening weekend edition;[7] the Saturday morning paper was to sell for the same 15¢ as had been charged for the Monday–Friday evening papers. The total weekly charge for seven papers would thus be $1.20 as against the previous charge of $1.05 for six.

On October 27, 1977, the News announced as part of its new program that for the first five weeks, November 13 through December 11, subscribers would receive seven papers for the same $1.05 they had previously paid for six. The announcement stated, in solid capitals, that this was an "INTRODUCTORY" offer and also that after December 11 home delivery would be at $1.20 per week.[8] The News also issued a Notice to Newscarriers, which merely added that, during the promotion, customers who had subscribed only for the Saturday weekend edition should receive both the Saturday morning and the Sunday papers at the same price previously paid for the weekend edition. Advertising rates for the Sunday edi-

---

**6.** Blue Chip Stamps guaranteed its subsidiary's performance of this obligation.

**7.** The Toronto Star, whose proposed entry into the Sunday market was the final factor leading Buffett to conclude in July 1977 that "our course of action in Buffalo should be obvious", priced its Sunday paper at 30¢.

**8.** The judge said that "[t]he true substance of this advertisement is that subscribers already having the Evening News delivered six days per week will get the *Sunday* paper free" and

characterized as "a quibble" the News' contention that it was the "thin" Saturday morning paper that was being given away, 441 F.Supp. at 639. While nothing really turns on this, we would not dismiss the News' contention so swiftly. The Sunday paper contained many of the features of the previous Saturday night weekend paper and, for reasons already indicated, the Saturday morning paper was not particularly attractive to subscribers who had received Friday night's.

tion (except for rotogravure) were to be the same as for the previous weekend edition; the notice to advertisers stated:

280,000 Circulation Guaranteed

For A Minimum of Four Weeks

This suit and a motion for a broad preliminary injunction against what were claimed to be the News' predatory tactics were filed on the following day.

## II.

The judge heard the Courier's application for a temporary injunction on the basis of a stipulation of facts, affidavits and oral testimony. In an opinion rendered on November 9, 1977, with remarkable speed, 441 F.Supp. 628, he granted a temporary injunction much more limited than the Courier had sought. Although agreeing with the News that "[a]s to the Sunday paper, there is a legitimate business purpose to be served in introducing it to the present six-day Evening News readers so they may compare it with the Sunday Courier and decide which product to choose after the introductory period", 441 F.Supp. at 639–40, he concluded that the Courier had "shown a clear probability of success at trial on the issue of specific intent to monopolize." 441 F.Supp. at 641. The cornerstone of this conclusion was the judge's belief that while "[g]iving free samples of newspapers, as of any consumer product, can be a reasonable and appropriate method of getting the purchaser acquainted with something new," 441 F.Supp. at 643, "it would seem clear that one, or at most two free samplings would suffice. *Five*, as proposed, at the busiest, most profitable season, is clearly unreasonable. The true purpose is monopolistic, whether taken together with the 'guaranty' made to the advertisers, or alone," 441 F.Supp. at 643 (emphasis in original). The guaranty to advertisers, "taken together with the five week give-away, as it must" was likewise "a predatory action the purpose and effect of which is to attempt to monopolize." *Id.* These conclusions were thought to be buttressed by certain other findings, namely (1) that "Mr. Buffett made no secret of his economic motivations and

his acute awareness of the value which would be attached to ownership of the Evening News were it to become a monopoly"; (2) that the News' pretax earnings in a competitive market, $1,659,630 in 1976 and less in the two preceding years, would not justify an investment of $33,000,000 when (at the then prime rate of 7¾%) borrowing this sum would cost $2,557,500 a year; and (3) that Mr. Buffett bought the Evening News "without inspecting the physical plant or conferring with the personnel who would continue the operations for the new owner." 441 F.Supp. at 641–42. Although finding that there was no evidence that the News had disparaged the Courier or that its top management had caused or intended to cause dissemination of rumors of the Courier's expected demise, he decided that the Courier was entitled to protection "against raiding or an attack on its staff morale while this litigation continues." 441 F.Supp. at 644. The court found that the Courier would suffer irreparable harm unless an appropriate temporary injunction issued, and entered an injunction order. The pertinent provisions of paragraph 1 of this were as follows:

A. No more than two free issues out of the five such issues proposed, each of the Saturday and Sunday edition of the Buffalo Evening News may be delivered without additional charge to its daily or weekend subscribers on November 12, 13, 19 and 20, 1977. Effective on and after November 25, 1977, except to the extent authorized below, all Sunday editions must be sold for no less than 30 cents, and all weekday or Saturday editions shall be sold for no less than 15 cents. Delivery of free samples to persons or firms regarded in good faith as present or potential advertisers is not enjoined. Annual or semi-annual subscribers who had paid subscriptions through December 31, 1977 may, until that date, receive all future editions without extra charge.

B. For all Saturday or Sunday editions for dates on or after November 25, 1977, no oral or written guaranties, predictions or representations of circulation shall be given or expressed unless the

figure so expressed represents the good faith estimate of expected paid circulation for such editions, held by the publisher at the time, and unless there is also expressed in connection therewith, the effect, if any, of possible nonfulfillment on the rates charged.

C. All firms which cancelled advertising contracts or terminated customary advertising placement in the Sunday Courier between September 3, 1977 and the date of this decision, and placed advertising in the proposed Sunday News, shall be informed by the defendant that the "guaranty" of five issues at 280,000 circulation is withdrawn as to the last three of such five issues, and that such advertisers may cancel as to any or all of such last three issues without penalty.

D. Notwithstanding the foregoing, excess copies of pre-printed rotogravure or other Sunday paper components for dates on or after November 25, 1977, which were actually in existence and printed as of the date of this order, may be given away as promotional material in any reasonable fashion, and "sampling" which does not involve "blanketing" or "forcing" of circulation may be effected by free distribution of not more [than] Two and one-half (2½%) percent of the number of copies sold, after November 26, 1977, of each issue.

E. All employees, newscarriers, advertising solicitors and independent distributors of the Evening News shall be informed in writing by defendant that it is not defendant's policy to offer employment to Courier employees, unless such employees resigned or have been terminated prior to such offer, nor to predict to any person the insolvency, bankruptcy or discontinuance of publication of the Courier, or start rumors, or otherwise interfere with the Courier's contractual or employment relationships while this litigation is pending, and that they are not to do so, even in jest. Such policy shall be maintained in effect. This provision does not prevent expressions of opinion as to the relative journalistic merits or management capabilities of the two papers, or as to the comparative effectiveness of advertising in the two papers. Nothing herein contained extends to what may be written and published in the Evening News of and concerning the Courier, and no prior restraint thereon is intended;

. . .

On December 9, 1977, the News filed a notice of appeal.

Meanwhile the Courier had filed its first motion to hold the News in contempt for certain alleged violations of the order. The parties stipulated that the appeal should be withdrawn without prejudice subject to reinstatement within 15 days after disposition of the contempt motion. On February 21, 1978, the Courier filed a motion alleging additional instances of contempt and requesting further injunctive relief. Later, the News moved to modify the injunction so as to prevent what it claimed to be misrepresentations by the Courier.

On July 28, 1978, the judge disposed of the pending motions. He found one instance of civil contempt in that an advertising account representative of the News falsely stated, in February, 1978, that the circulation of the Sunday News was "162,000 and growing" when in fact it had been level at that figure since January 8, and that the Saturday edition had a circulation of "200,000 and growing each week" whereas this had declined from a high of 237,622 on December 3, 1977 to 223,434 on February 4. He declined to find contempt in another statement by the same representative, in a "bloviation" between a News employee and a Courier employee at a neighborhood pub on March 15, 1978, or in improper tactics in soliciting subscriptions, concededly not within the letter of the injunction, by employees of Circulation Builders Enterprises, Inc. working for the News. The judge also refused to modify the injunction as the News had requested. The News appealed from the adverse portions of the order and a judge of this court allowed reinstatement of its appeal from the preliminary injunction.

### III.

■ We can rapidly dispose of appellee's suggestion that the appeal from the preliminary injunction is moot. Obviously nothing this court can now do would allow the News to give the special rates it had proposed for the weekends of November 25–26, December 2–3 and December 9–10, 1977, or relieve the News from compliance with paragraph 1C. However, paragraph 1A of the injunction would prohibit the News from any further free distribution of a Saturday or Sunday paper except as permitted by paragraph 1D. Also paragraphs 1B and E remain in full force, and the former constitutes the predicate for the order of civil contempt.

The current Second Circuit rule on the grant of preliminary injunctions was most recently stated, after some previous backing and filling, see Mulligan, Foreword: Preliminary Injunction in the Second Circuit, 43 Brooklyn L.Rev. 831 (1977), in *Caulfield v. Board of Education of the City of New York*, 583 F.2d 605, 610 (2 Cir. 1978):

> there must be a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

See also *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2 Cir. 1976). Here the judge found that the Courier met the first criterion. However, if we conclude that this was error, as we do, we must also consider whether the injunction can be upheld under the second criterion.

■ The district court had no sufficient basis for holding that the Courier had shown a clear probability of prevailing in its action for an attempt to monopolize. Such an attempt requires the employment of methods which, though falling short of monopolization, create a "dangerous probability" of it, *see Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905), with the specific intent "to destroy competition or build monopoly." *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). The intent alone is not sufficient, although, of course, it may give color to the acts. Similarly, acts alone are insufficient, although they may evidence intent.

Taking first the issue of intent, we find simply no evidence that Mr. Buffett acquired the News with the idea of putting the Courier out of business as distinguished from providing vigorous competition, including the invasion of what had been the Courier's exclusive Sunday market. He testified that he had never considered whether putting out the Sunday paper might put the Courier out of business; that he thought the Courier would be in business for a long time; and that at the outset he expected the News' Sunday edition to receive a minimum of 25% of what he assumed would be an increased combined Sunday advertising revenue of the two papers. Appellee places great weight on an article in the Wall Street Journal wherein an investment banker quoted Buffett as having said that owning a monopoly newspaper was like owning an unregulated toll bridge. Buffett denied making such a statement and, although he conceded that owning such a paper, especially in a small town without a television station, a description scarcely met by Buffalo, is "a great business" and that he would like to own such a business, he testified that he never had and had no such thought when he acquired the News. While the court was not bound to accept Mr. Buffett's assertion, this was bolstered by his uncontradicted testimony that monopoly newspapers sold for approximately three times gross revenues whereas the range for non-monopoly papers was from .6 to 1.6 times gross revenues, and that he had paid .8 of gross revenues for the News. The judge also found it significant that the ratio of the News' 1976 earnings to the purchase price was less than the annual cost of borrowing what would have been needed to pay for it at the then prime rate of 7¾% if Blue Chip Stamps had been forced into

that method of financing. But as Mr. Buffett testified, he purchased on the basis of the News' anticipated earnings under new management, as one of two Buffalo papers, not its past earnings. Such behavior is not uncommon; even today, with the prime rate in the vicinity of 11% financial papers are filled with reports of purchases of and tender offers for companies whose earnings are a smaller percentage of the purchase price than was true of the News.[9] All that the record supports is a finding that Mr. Buffett intended to do as well as he could with the News and was not lying awake thinking what the effect of its competition on the Courier would be. This is what the antitrust laws aim to promote, not to discourage. Courts must be on guard against efforts of plaintiffs to use the antitrust laws to insulate themselves from the impact of competition. See *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 972 (8 Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969).

We likewise see no basis for concluding that the News was proposing to engage in predatory acts. The principal act relied upon is that free copies, whether this be deemed of the Sunday or of the Saturday morning News, see note 8, *supra*, were to be offered for five weeks rather than for only two, which the judge conceded would be proper. There was no evidence to support the finding that this was predatory. Mr. Fallis, Vice-President of the News, cited two instances of free sampling when a new Sunday paper was introduced. In both of these, one in Toronto, Canada, and the other in Westchester County, New York, the Sunday paper was delivered free for four weeks. Clearly this does not support a

finding that anything over two was excessive, even in light of Mr. Buffett's concession that the News' problem was somewhat easier since subscribers were already familiar with its weekend edition. The Courier introduced no proof that sampling for a period of more than two weeks was unusual. Also there was no sufficient evidence that the five week sampling would produce even a short-term loss for the News' operations taken as a whole, see Areeda & Turner, Predatory Pricing and Related Practices Under Section Two of the Sherman Act, 88 Harv.L.Rev. 697, 728–30 (1975). In an attempt to monopolize case, courts should exhibit restraint in imposing on the market their own notion of what constitutes improper competitive behavior.

Doubtless the district court could have held, even in the absence of evidence, that if the News had offered free copies to subscribers for ten weeks, that would have gone too far. But to impose a limit of two weeks without evidence to show that this was the limit of reasonableness—indeed in the face of evidence that other newspapers had offered four—is going beyond the proper judicial role. As Professor Cooper has written:

> [j]udicial competence to evaluate competitive behavior is limited . . . . Once the invitation to intrude into areas of lesser market power is accepted, it is difficult to resist the seductive temptation to pass adverse judgments on neutral or even desirable forms of competitive behavior.

Attempts & Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two, 72 Mich.L.Rev. 373, 378 (1974).[10] See generally *Gold Fuel Service*,

---

**9.** The judge conceded that his financial analysis might "be somewhat simplistic," 441 F.Supp. at 642 n. 6. Certainly it omitted one factor that has caused current purchases at what seem high price/earnings ratios, namely, that plants were constructed at prices representing a small fraction of what they would cost today. The fact that any plant capable of turning out the News must be worth far more than its book value constitutes at least some explanation for Mr. Buffett's failure to inspect the plant and talk to the News' staff. He added that he did

not believe the agent for the seller would like his going to the property; obviously such visits have a disturbing effect on personnel if the transaction is not consummated.

**10.** The judge properly recognized that his ruling drew no support from what appears to be the only case where newspaper sampling has been claimed to be an attempt to monopolize, *Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 342 F.Supp. 1138 (D.N.D. 1972), aff'd 493 F.2d 383 (8 Cir.), *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974). There the papers of

*Inc. v. Esso Standard Oil Co.,* 306 F.2d 61 (3 Cir. 1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1963); *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 721–23 (5 Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358–59 (9 Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Pacific Engineering and Production Co. of Nevada v. Kerr-McGee Corp.,* 551 F.2d 790 (10 Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 290 n. 101 (5 Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

The only other feature of the News' promotional campaign which the judge found to have been predatory was its notice to advertisers quoted on p. 52 *supra.* The principal criticism is that the notice did not explain that the News' ability to guarantee a 280,000 circulation for the new Sunday edition for a minimum of four weeks was due in large part to its giving away the Sunday paper to all who had subscribed to its Saturday weekend paper, so that its only risk lay in making enough newsstand and store sales to fill the gap between this number and 280,000 which, the judge thought, would probably present no difficulty, 441 F.Supp. at 640. The record is not clear whether recipients of the notice had or had not been informed of the News' promotional plan.[11] If they had not been, the notice was indeed somewhat disingenuous. Still it clearly put advertisers on notice that the guarantee was "for a minimum of four weeks" and only the most unsophisticated

advertiser would refrain from asking why. While the notice may have constituted an unfair competitive practice, any inadequacy in it is not enough, alone or in combination with other evidence, to support a finding of attempt to monopolize.[12]

In our view the court also exaggerated the peril of the News' promotional program to the Courier. Here we do not need to enter the thicket of deciding whether, in a case where there is harm to the defendant, the requirement of "possible irreparable injury" is satisfied simply by showing, as the plaintiff did here, that harm suffered in the interval before final judgment cannot be repaired by an award of damages—whether because these cannot be accurately measured, because the defendant is insolvent, or for some other reason—either generally or under the express language of 15 U.S.C. § 26 that a preliminary injunction shall issue in a private antitrust case only upon a showing "that the danger of irreparable loss or damage is immediate," see *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 743 (2 Cir. 1953); *SCM Corp. v. Xerox Corp.,* 507 F.2d 358, 360 (2 Cir. 1974); *Triebwasser & Katz v. American Telephone & Telegraph Co., supra,* 535 F.2d at 1359—a question on which our own decisions and those of other courts are not readily reconcilable. See *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2 Cir. 1979). When a plaintiff-competitor charges an attempt to monopolize, the seriousness of the threat to its economic health is an essential element of the offense and unless this is established, there is no adequate showing of probability

---

the Bismarck Tribune were distributed free to nonsubscribers in a nearby small town primarily served by the Pioneer. The "blanketing" began in April and May, 1963, and continued daily for three weeks. After a two week pause, the Tribune blanketed again for a week. The blanketing was resumed in September and October, 1963, was continuous for a week, and also occurred each Wednesday of those months, the heavy grocery advertising day. In early 1965, blanketing occurred on eight days in January and February and seven in March. Even on this showing the court awarded only

nominal damages, no injunction having been sought.

11. The notice did state that the News had had a circulation of about 280,000 for its evening edition and of about 299,000 for its weekend edition.

12. The same comment applies to the judge's criticism of the failure of the notice to state what remedy the advertiser would have if the 280,000 figure was not met, a contingency which he had found exceedingly unlikely.

of success. An attempt to monopolize is not made out unless the methods used evince a dangerous probability of destroying competition. See *Swift & Co. v. United States, supra,* 196 U.S. at 396, 25 S.Ct. 276.

■ In seeking to show that the News' program would drive it to the wall, the Courier's principal reliance had been on the plan to charge 30 ¢ rather than 50 ¢ for the Sunday edition.[13] The judge seems not to have realized how deeply the Courier's case that the News was engaged in an attempt to monopolize was undercut by his inability to find that 30 ¢ was an unreasonably low price, 441 F.Supp. at 643. The Courier had submitted nothing to show that "the 'guaranty' to advertisers, taken together with the five week give-away", the only predatory actions found by the judge, 441 F.Supp. at 643, created any danger of its being swiftly removed from the scene. Although the Courier had suffered an operating loss of $151,786 in 1975 and had earned operating income of only $100,747 in 1976, both figures were computed after deducting some $315,000 in depreciation charges. As of December 31, 1976, it had current assets of $3,826,768 as against current liabilities of $1,964,995, no long-term debt [14] and stockholders' equity of $8,986,330. This is not the picture of a paper that cannot survive a fight of five weeks or even the longer period before a full trial could be had;[15] the analogy which the court sought to draw with *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2 Cir. 1970), where Ford proposed to cancel Semmes' dealership, was mistaken.

We must now consider whether, although the grant of the temporary injunction was not justified on the basis of probable success on the merits, as the court found, it can be upheld upon another one. That is that since the plaintiff showed irreparable injury in the sense of demonstrating the impracticability of computing damages, there were "sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief," *Caulfield v. Board of Education, supra,* 583 F.2d at 610, a question which, on his view of the case, the judge did not have to reach. The questions the judge placed in this category, in addition to Mr. Buffett's intent, which would not alone carry the day for the Courier even if he found in its favor, were whether the 30 ¢ price and the advertising rates for the Sunday edition were unreasonably low. 441 F.Supp. at 643–44.

We have serious doubt whether these issues presented "fair ground for litigation." As the judge himself recognized, *id.,* the 30¢ price was that at which the current weekend edition of the News was being sold. There was no evidence to show that this had been unprofitable or that the profits from a similarly priced Sunday paper would be materially lower if adequate circulation could be achieved. It was also the same price at which the Toronto Star was selling its new Sunday edition. Mr. Buffett and Mr. Fallis submitted affidavits that a 30 ¢ Sunday edition would be profitable if total Sunday advertising increased by 23% and the News attracted only 25% of that total.[16]

---

**13.** Hindsight has shown that the Courier's assertion that its 50 ¢ Sunday paper could not compete against the News' 30 ¢ paper was wholly without basis. The Sunday Courier averaged 257,000 circulation in February, 1978; the Sunday News averaged 169,380.

**14.** In view of this we do not understand why the judge thought the News enjoyed an advantage because it "owns its plant free and clear." 441 F.Supp. at 644.

**15.** As part of its proof of harm, the Courier presented evidence of three cancellations of scheduled advertisements during the introductory period "in favor of the Evening News"

amounting, according to the affidavit of the Courier's treasurer, to $11,572. It is not clear whether these cancellations resulted from the allegedly predatory acts or from the mere introduction of the Sunday paper; in any case, this is altogether too small a figure compared to the assets of the Courier or its total Sunday advertising revenue of almost ten million dollars a year to suggest a threat of immediate disaster.

**16.** While the figures may have been predicated on too high an estimate of the News' share of the Sunday market, see note 13 *supra,* this may not be too consequential since, to the extent that the News' penetration were less than ex-

The Courier did not challenge this except by pointing to the 50 ¢ Sunday rate charged by itself and other papers; the News countered that these were all in monopoly markets. As the court also noted, the advertising rates (except for rotogravure) also were "basically those now in effect for the Week-End Edition," 441 F.Supp. at 644; the fact that these were less than the Courier's rates for its exclusive Sunday edition does not condemn them. The rates on rotogravure were initially framed on the basis of those in other areas but were then adjusted upward to approach those of the Courier. As said in *Hanson v. Shell Oil Co., supra,* 541 F.2d at 1358–59 (9 Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977):

> The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business.

See also *Weber v. Wynne,* 431 F.Supp. 1048, 1059 (D.N.J. 1977). Beyond this the very *pro forma* figures for the News which the Courier had presented to show that the introductory offer was predatory would show a significant profit when adjusted for the 30 ¢ price and announced advertising rates after the introductory period.

■ However, we need not decide whether these issues presented a fair ground for litigation since we do not perceive "a balance of hardships tipping decidedly" toward the Courier. In applying this criterion district judges should keep vividly in mind Judge Mulligan's comment in *Triebwasser & Katz, supra,* 535 F.2d at 1359:

> If the element of irreparable damage is prerequisite for relief where the plaintiff must show probable success on the merits, then *a fortiori* where the plaintiff establishes something less than probable success as to the merits, need for proof of

the threat of irreparable damage is even more pronounced.

A "balance of hardships tipping decidedly toward the party requesting the preliminary relief" must mean real hardship from the denial of relief *pendente lite*—not merely the showing of difficulty of measurement which may suffice to constitute "irreparable damage" where a plaintiff shows probable success. For enlightenment on what may be a decided tipping of the balance of hardships, it is instructive to read the findings of the district court in the case that gave birth to that doctrine, *Hamilton Watch Co. v. Benrus Watch Co.,* 114 F.Supp. 307, 311, 313–14 (D.Conn. 1953) (Hincks, J.), which were relied on by the Court of Appeals, 206 F.2d at 743 & n. 9. See also *Semmes Motors, Inc. v. Ford Motor Co., supra,* 429 F.2d at 1205.

■ There can be no doubt that if the Courier had shown a significant possibility that it would be driven out of business by the News in the period before a trial could be held,[17] the *Hamilton-Benrus* test would have been amply passed. But, as our previous discussion shows, this is just what the Courier did not do. The court may have been justified in accepting the assertion of Mr. Lyons, secretary and treasurer of the Courier, that, without revenue from its Sunday paper, "the Courier could not survive" and that "[w]ere it not for the Sunday Courier, there would be no daily Courier published." But this is a long way from establishing that the Sunday Courier *would* sink in the interval before a final decision unless the federal court stepped into the ring "to see that the Evening News fights according to the Marquis of Queensberry", 441 F.Supp. at 645—a test not mentioned in § 2 of the Sherman Act or in previous decisions applying it. While the injunction order should not be condemned by hindsight, the figures in note 13 as to what happened under a temporary injunction

---

pected, any injury to the Courier would be correspondingly diminished.

**17.** We do not see why this should have been very long. Unlike the typical antitrust suit, this case did not involve years of activity in many parts of the country but competition between two newspapers in a single city. Most of the relevant evidence dealt with events of the past few months.

that did not accord the relief the Courier deemed most needed, to wit, an injunction against setting advertising rates or the price of the Sunday News at "unreasonably low" levels, serve to indicate how wide of the mark the court's apprehension was.

### IV.

■ The Courier strongly reminds us of statements that the grant or denial of a temporary injunction lies within the trial court's discretion, *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 441 (2 Cir. 1977); that the test is not whether another district judge would have arrived at a different—presumably preferable—result, *Columbia Pictures Industries, Inc. v. American Broadcasting Cos., Inc.*, 501 F.2d 894, 897 (2 Cir. 1974), or even whether the appellate court would have done what the trial judge did, *Hamilton Watch Co. v. Benrus Watch Co.*, supra, 206 F.2d at 743 n. 10; and that not merely a simple but a "clear" abuse of discretion is required to warrant reversal, *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2 Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). The cases do not throw much light on why there should be such appellate abnegation to the district court's ultimate conclusions as distinguished from its findings of fact which are protected by the rule, F.R.Civ.P. 52(a), that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Perhaps the doctrine comes down from days when temporary injunctions were really temporary. It is established on the other side that when the grant or denial of a temporary injunction "is based upon an erroneous legal premise . . . the order is then reviewable as is any other conclusion of law." *Douglas v. Beneficial Finance Co. of Anchorage*, 469 F.2d 453, 454 (9 Cir. 1972), see *Ring v. Spina*, 148 F.2d 647, 650 (2 Cir. 1945). It has also been said that "the granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292, 293 (3 Cir. 1940), quoted in 6 Toulmin, Antitrust Laws § 24:14. Confusion is further compounded by radically different notions of the meaning of "discretion" and "abuse of discretion." [18] This circuit is not alone in having voiced dissatisfaction with contentions that would render the review of the grant or denial of temporary injunctions the largely meaningless ritual urged by appellee. See *Carroll v. American Federation of Musicians*, 295 F.2d 484, 488 (2 Cir. 1961); *Omega Importing Co. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1197 (2 Cir. 1971); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 193 (4 Cir. 1977).

Be all this as it may, the previous discussion shows why, in our view, the decision to grant a temporary injunction was suffi-

---

**18.** One view is represented by the statement in *Delno v. Market St. Ry.*, 124 F.2d 965, 967 (9 Cir. 1942):

Discretion, in this sense, is abused when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

A sharply contrasting view was voiced by Chief Judge Magruder in *In re Josephson*, 218 F.2d 174, 182 (1 Cir. 1954):

"Abuse of discretion" is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.

The Ninth Circuit, without citation of *Delno*, has since followed or even gone beyond the *Josephson* formulation, see *Pearson v. Dennison*, 353 F.2d 24, 28 n. 6 (9 Cir. 1965) (Duniway, J.):

We do not much like the term "abuse" in this context. It has pejorative connotations not here appropriate. But it has become the customary word. Perhaps "misuse" is milder. What we mean, when we say that a court abused its discretion, is merely that we think that it made a mistake. There are, however, cases in which the term abuse is appropriate.

**60**

ciently infected with legal and factual error that, with all respect to the able and devoted district judge, it must be reversed even under the stringent standards urged by appellee. In our view the court did not sufficiently appreciate the narrow limits that must be placed on the attempt to monopolize offense if charges of this nature are not to become a serious anti-competitive measure. As Professor Cooper has said in the article previously cited, 72 Mich.L.Rev. at 451:

> Private litigants have already asserted attempt claims in efforts transparently designed to shield against desirable, effective competition. Although the defendants have so far prevailed, the very ability to impose on competitors the heavy burden of antitrust litigation over claims that cannot be dismissed at the outset is dangerously anticompetitive in itself.

See also *id.* at 435. We find in the record no direct evidence either of "a specific intent to destroy competition or build monopoly", *Times-Picayune Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953), or of the illegal acts which are necessary, in addition to specific intent, to constitute the offense. With no demonstration of probable success, the Courier thus must rely on the *Hamilton-Benrus* doctrine. Since the judge made no findings on that score, we have full power to review and conclude that the test was not satisfied.

### V.

■ The Courier does not dispute that if the preliminary injunction is vacated, the findings of civil contempt cannot stand. As said in *United States v. United Mine Workers of America*, 330 U.S. 258, 294–95, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947):

> [Although] a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal, [the rule is different with respect to a finding of] civil contempt based upon a violation of the same order. The right to remedial relief falls with an injunction which events prove was erroneously issued.

Our vacating of the injunction moots the News' request for a modification that would cause paragraphs 1B and 1D to bear equally on both parties.

The preliminary injunction and the findings of civil contempt are vacated with costs, and the News' appeal from denial of its motion to modify the injunction is dismissed without costs.