**VORNADO, INC., Plaintiff,**

v.

**INTERSTATE PROPERTIES, Defendant.**

**No. 79 Civ. 2384.**

United States District Court,
S. D. New York.

May 24, 1979.

Shea, Gould, Climenko & Casey, New York City, for plaintiff; Ralph L. Ellis, Richard L. Spinogatti, Marilyn A. Marlek, Steven R. Sutton, Allan R. Tessler, New York City, of counsel.

Finley, Kumble, Wagner, Heine & Underberg, New York City, Sullivan & Cromwell, New York City, for defendant; Jeffrey A. Fillman, Edward W. Keane, Charles E. Wilson, New York City, of counsel.

LASKER, District Judge.

In this suit under Sections 14(a) and 13(d) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78m(d), Vornado, Inc. moves for a preliminary injunction restraining Interstate Properties from further solic-iting proxies from Vornado's stockholders in connection with the scheduled election of three directors to Vornado's Board of Directors, exercising proxies previously obtained, and voting its shares of Vornado's common stock. It is alleged that the Schedule 13D and seven amendments filed by Interstate in connection with its acquisition of Vornado's stock, and Interstate's proxy statement to Vornado's stockholders, are materially misleading.

## I.

Interstate Properties is a partnership in the business of developing and operating shopping centers. Vornado, Inc. owns a chain of large retail discount stores. In January, 1978, the partners of Interstate, under the leadership of Steven Roth, Managing Partner, determined that purchase of the stock of Vornado would be a profitable investment because, in their opinion, its market value was notably low in relation to its book value. In particular, Roth was struck by the fact that Vornado, as the result of liquidating several of its large stores in the west coast area, had large reserves of cash. Moreover, his analysis led him to believe that Vornado's operations were over extended. It was his view that it would strengthen Vornado's financial position to dispose of stores separated from its clustered New Jersey and Philadelphia area operations, since the small number and outlying location of those other stores prevented Vornado from being a force in the markets in which they were located.

Prompted by these considerations, Interstate determined to make an investment in Vornado in a sum of $5,000,000. to $7,000,-000., the largest single sum by far which it had theretofore invested in another company. Accordingly, Interstate embarked on a program of purchasing Vornado's stock, and by May 31, 1978, had acquired more than 5% of the outstanding shares of Vornado. As a result, it was required to and did file a Schedule 13D with the Securities and Exchange Commission. Between that date and April 12, 1979, as Interstate acquired

716

more stock of Vornado, or its intentions with regard to the use of the stock altered, it filed seven amendments to its Schedule 13D.

In the summer of 1978 and through October 10th of that year, Roth met five or six times with Frederick Zissu, Chairman of the Board and Chief Executive Officer of Vornado. At these meetings, Roth sought to persuade Zissu of Interstate's view that Vornado had more cash than it needed; that it should distribute to its stockholders an appropriate portion of the cash on hand from the past sale of stores; and that it should also sell the "outlying stores" referred to above. At one of the early meetings, Zissu rejected Roth's suggestion that Vornado distribute to its stockholders some of the "excess" cash realized through the sale of Vornado's west coast stores, and Roth did not raise the issue again. Roth and Zissu discussed the possibility that Vornado might sell all or some of its outlying stores to third parties, and also their possible sale to Interstate itself. In connection with this proposal, Roth conducted informal discussions, limited in number, with other large scale merchandisers such as F.W. Woolworth and Stop and Shop (to some of which Interstate had leased store space), to determine whether they might be interested in leasing or purchasing the outlying stores. Roth did not inform Zissu of these discussions.

Shortly before October 10, 1978, Mr. Zissu advised Roth that in the opinion of Vornado's counsel, Vornado could not enter into any negotiations with Interstate for the sale or lease of the outlying stores because of what Vornado's attorney believed to be Interstate's status as an insider. Accordingly, on October 10th, Roth and Zissu met at the offices of Zissu's counsel, together with Interstate's counsel, to discuss the matter. At that meeting, Roth suggested the possibility of an auction of the properties as a device which might cure the problem if it existed, but Vornado rejected the suggestion of any possible sale or lease to Interstate. No meetings of Roth or Zissu, or other representatives of the parties, occurred before the initiation of this litigation.

On April 28, 1979, Interstate mailed a proxy statement to Vornado's shareholders, soliciting support for its candidates for election to the three Vornado directorships to be filled this year. In its proxy statement, Interstate proposes a plan for the company's future. It consists not only of the sale of the outlying stores which Roth discussed with Zissu but also specifies that the proceeds from such a sale be distributed to Vornado's stockholders by the mechanism of a tender offer. The Interstate proxy statement specifically refrains from suggesting what the terms of such a tender offer should be; and specifically excludes a current commitment by Interstate to accept such an offer if one is made in the future.

This motion for a preliminary injunction was filed May 4, 1979 promptly upon the filing of the complaint. It was brought on by Order to Show Cause because Vornado's scheduled annual meeting of the stockholders was to be held on May 22, 1979. Although that meeting has been held as scheduled, the matter is not moot because Vornado continues to request that its relief be granted prior to completion of the count of stockholder votes, which will not occur until May 29, 1979 at the earliest. A hearing on the motion was held on May 14th, 15th and 16th, 1979.

II.

Vornado contends that Interstate's Schedule 13D and its amendments are materially misleading because they fail to disclose the true substance of the discussion between Roth and Zissu during the summer and fall of 1978, and various incidents that Vornado alleges occurred during these discussions, and because they fail to disclose that Interstate contemplated a tender offer by Vornado for its own stock as a means of distributing to Vornado's stockholders a portion of the proceeds from past or future sales of Vornado stores.

Moreover, Vornado alleges that Interstate's proxy statement to the Vornado stockholders in connection with the election

of directors at the May 22, 1979 meeting is misleading, and therefore violates Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9, in the following respects: first, it does not describe Interstate's proposed program for the sale of outlying stores and the distribution to stockholders of the proceeds in adequate detail; second, it does not adequately disclose the obstacles to the implementation of the proposed program; third, it inaccurately states that Vornado's management rejected a similar proposal; fourth, it inaccurately represents Interstate's intentions with regard to a tender of its own Vornado holdings in the event a tender offer is made in an effort to distribute to stockholders the proceeds for past or future sales of Vornado stores; fifth, it fails to disclose Interstate's business dealings with Vornado's competitors; sixth, it inaccurately represents that Interstate enjoys expertise in retailing and mass merchandising; and seventh, the use of a quotation from Forbes Magazine in the proxy statement inaccurately implies that Forbes has taken an editorial position favorable to Interstate and its program.

In answer Interstate argues that 1) neither its Schedule 13D nor the amendments thereto nor its proxy statement violate the law on account of omissions or misrepresentations; 2) that if any facts are omitted from such documents or such documents do contain any misrepresentations, the omissions or misrepresentations are immaterial; and 3) citing *Rondeau v. Mosinee Paper Corporation,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), that no preliminary injunction can be granted to redress violations of the Williams Act except upon a showing of irreparable harm, and that no such showing has been made.

### III.

This case is governed by the provisions of the Williams Act as construed by the courts. A purpose of the Act is to ensure that public shareholders, when called upon to consider a proposed change of management or control of their company are furnished adequate information regarding the qualifications and intentions of the party proposing the change. See *Rondeau, supra,* at page 58, 95 S.Ct. 2069. It is the norm that the stockholders themselves be free to decide such questions by their votes without interference by the courts. For this reason among others, the Supreme Court has determined that an injunction may be granted under the Act only in accordance with "traditional standards for extraordinary equitable relief," including a showing of irreparable harm. *Rondeau, supra,* at 57, 95 S.Ct., at 2075.

In this Circuit, the "traditional" rule is that preliminary injunctive relief may be granted only upon a showing

> "of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Caulfield v. Board of Education of the City of New York,* 583 F.2d 605, 610 (2d Cir. 1978) (emphasis in original); *accord Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48 (2d Cir. 1979); *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1358 (2d Cir. 1976). We find that Vornado has not demonstrated any of these factors, and that accordingly the motion must be denied.

Vornado contends that Interstate's Schedule 13D and its seven amendments were misleading because they failed to disclose the substance of the discussions between Roth and Zissu during the summer and fall of 1978. However, the second amendment to Interstate's Schedule 13D, which was filed with the SEC on July 12, 1978, disclosed that Roth had met with Zissu, and that they had

> "discussed in general terms various business strategies concerning Vornado, including potential acquisitions by Vornado, the sale of a number of Vornado stores, including the sale either to or through Interstate, the closing of various stores

and the leasing thereto [sic] to third parties, and the expansion of Vornado's retail business."

This general characterization of the discussions is consistent with the evidence developed at the hearing on this motion.

Vornado alleges, however, that during these discussions Roth threatened a proxy fight unless Vornado agreed to sell Interstate certain of its outlying stores, and that on one occasion Roth requested representation on Vornado's Board of Directors. The first of these allegations highlights the two parties' different versions of what occurred during the discussions in question. Zissu's testimony at the hearing suggested that Interstate's primary interest was in acquiring some of Vornado's stores for itself on advantageous terms. Roth's testimony was that his primary concern was promoting Interstate's suggestions for improving Vornado's operations. On the whole, Roth's version is the more convincing one. In any event, Vornado has not established by a preponderance of the evidence that Roth did threaten a proxy fight, or that Interstate developed a firm intention to wage a proxy fight prior to January, 1979, when it filed the fourth amendment to its Schedule 13D, which stated that Interstate "may determine to attempt to gain control [of Vornado] through solicitation of proxies, a tender offer, merger, or similar transaction." Nor has Vornado carried its burden of proving that Roth requested representation on Vornado's board, especially in light of the fact that Vornado has suggested no reason why Interstate would wish to conceal such a request had it made one.

Vornado also asserts that Interstate's failure to disclose in the amendments to its Schedule 13D filed after Roth and Zissu's final meeting on October 10, 1978, that Interstate had suggested at that meeting that if Interstate's insider status created any problems with regard to a sale of outlying stores "to or through Interstate," the stores could be sold at auction. However, Interstate's proxy statement does disclose that Interstate made such a suggestion. Assuming that Vornado is correct in asserting that

a shareholder deciding how to vote in the proxy contest would consider the fact that Interstate made such a suggestion significant, Interstate's failure to disclose the proposal in its Schedule 13D filings has been cured by the disclosure in the proxy statement. Even if Interstate's Schedule 13D filing was defective in this regard, Vornado is not now threatened with irreparable injury as a result, since the stockholders who must, by their votes at the scheduled annual meeting, support or reject Interstate and its program, have now been informed of Interstate's suggestion, and can accord it what weight they will.

Vornado contends that the seventh amendment to Interstate's Schedule 13D is misleading because it failed to disclose that if its program was adopted, Interstate would suggest that the proceeds from the sale of outlying stores be distributed to Vornado's stockholders by means of a tender offer by Vornado for its own stock. Interstate's seventh amendment did state that "Interstate will attempt to cause Vornado to distribute to stockholders proceeds realized from the sale or lease of such of such properties," but Vornado argues that Interstate had already determined, when this amendment was filed on April 12th, that this distribution should take the form of a tender offer. Its sole support for this argument is an early draft of Interstate's proxy statement, dated April 10th, which specifies that the preferred mechanism would be a tender offer.

Even assuming that the fact that the particular method Interstate contemplated as the means of distributing the proceeds of sales of stores is material (rather than simply the fact that Interstate contemplated a distribution by one means or another), Vornado's argument is unavailing. First, the fact that an early draft of the proxy statement specifies a tender offer as the preferred mechanism for making a distribution is not conclusive evidence that Interstate had made a firm decision to employ that mechanism at the time the draft was prepared. Second, the proxy statement states that a tender offer is the method Interstate

now proposes as the means to effect a distribution to Vornado's stockholders. Once again, whatever defects there may have been, if any, in Interstate's Schedule 13D filings, they do not now pose a threat of irreparable harm: Interstate's proxy statement fully informs Vornado's stockholders of the facts material to their decision to support or oppose Interstate and its program.

Vornado's attack on Interstate's proxy statement is more pervasive, but no more successful, than its attack on Interstate's Schedule 13D filings.

Vornado's first objection to Interstate's proxy statement is that it fails to describe the program proposed by Interstate in sufficient detail. However, Section 14(a) does not establish minimum standards of specificity for proxy statements. It simply requires that the statements contained in proxy statements be accurate. Interstate's proxy statement frankly admits that "Interstate has not made a detailed study of the feasibility of disposing of any of Vornado's stores or the effects of such dispositions on Vornado," and that "it is not possible at this time to be precise as to the terms or timing" of any tender offer designed to distribute the proceeds from the sales of any of Vornado's stores to Vornado's stockholders. Vornado does not argue that these statements are inaccurate, but rather that they belie weaknesses in Interstate's proposal. However, it is up to Vornado's stockholders, not the court, to evaluate Interstate's program in the light of these disclosures.

Vornado's second objection to Interstate's proxy statement is that it fails to disclose adequately the obstacles to the implementation of Interstate's program. This contention is not borne out by a reading of the proxy statement, which repeatedly states that even if Interstate is successful in its proxy battle, it will not control Vornado's board, that there can be no assurance that if its candidates are elected the proposed program will be implemented, and that the feasibility and success of the program will depend in large measure on future events.

Vornado's third argument is that Interstate's proxy statement is misleading because its states that management rejected "a program similar to that now being proposed by Interstate," when in fact, according to Vornado, a "similar" program was never discussed with management. Vornado admits that Roth and Zissu discussed the sale of outlying stores, and that Roth's suggestion was ultimately rejected. However, the second element of the program, the distribution to Vornado's shareholders of proceeds by way of a tender offer, was never discussed. Nonetheless, Zissu testified that he rejected Roth's proposal that Vornado distribute the proceeds from the sale of its west coast stores by buying in its own stock, and it was reasonable for Roth to assume that Zissu might well reject a similar scheme for distributing the proceeds from the proposed sale of outlying stores as well. The statement that Vornado's management had rejected a "similar program" can be open to attack only on an analysis of extreme literalism: under the circumstances here it can hardly be said to be misleading.

Vornado's next contention is that Interstate's proxy statement inaccurately discloses Interstate's own intentions in the event its program is adopted and a tender offer made. The proxy statement states at page 10 that "Interstate is not now in a position to determine whether it would or would not tender its shares" in such circumstances, explains why this is so, and announces that Interstate would state its intentions when a tender offer was made, if ever. Vornado asserts, however that Interstate had already determined, when it issued its proxy statement, not to tender its shares. This claim is based on a bracketed passage in an early draft of Interstate's proxy statement that appears in apposition to contrary language on the same page. The language on which Vornado relies represents one alternative drafted by Interstate's counsel for Interstate's consideration, and cannot fairly be said to reflect Interstate's past or present intention. There is no reason to believe that Interstate's statements in its

proxy statement regarding its intentions in the event a tender offer is made are inaccurate in any way.

Vornado argues that Interstate's proxy statement is misleading because it does not disclose that Interstate does business with some of Vornado's competitors, and that Interstate discussed the sale of various of Vornado's outlying stores with them. Roth testified that Interstate has leased (sometimes on a percentage basis) and sold space in shopping centers it operates to large retail discount chains that compete with Vornado. However, Vornado has not adduced any evidence suggesting a conflict of interest growing out of Interstate's business dealings with Vornado's competition nor that any of those dealings, including the discussions of sales of Vornado stores, involved anything other than arms-length transactions. In short, Vornado has not shown that the alleged omissions are material.

Vornado asserts that Interstate's proxy statement represents that Interstate enjoys expertise in retailing and mass merchandising when in fact it does not. A review of the proxy statement, however, discloses that Interstate nowhere claims expertise in such matters.[1]

Finally, Vornado argues that a reference to Forbes Magazine in Interstate's proxy statement is misleading because it implies that Forbes has editorially endorsed Interstate's activities. The proxy statement contains the following at page 4:

FORBES Magazine in a May 15, 1978 commentary on Vornado observed:

"Zissu's management of the troubled retailer does not stand up well to close scrutiny. It's been a disaster, one setback after another in what was once a successful merchandising operation." *

There follows a footnote:

* The consent of FORBES to the use of this brief quote from its previously published article has been obtained. Neither Interstate, its nominees, nor any other participant in its solicitation of proxies has made, or proposes to make any payments or give any consideration in connection with the preparation or publication, or the use herein, of the quoted article.

Significantly, Vornado's discussion of Interstate's use of this material dwells on the circumstances under which Forbes' consent to its use was obtained, not on the effect that its use might have on a stockholder considering Interstate's proxy solicitation. Ms. Betty Franklin, who consented to the use of this material on behalf of Forbes, testified that she would not have given her consent had she known that the material was to be used in a proxy statement, and that she would have withdrawn her consent when she learned it was to be so used had she not thought that the proxy statement had already been printed. However, all this is immaterial to the issue presently before the court, which is whether Interstate's proxy statement is misleading. Despite Vornado's claim to the contrary, nothing in Interstate's proxy statement implies that Forbes has endorsed Interstate's opposition to Vornado's present management or Interstate's proposed program for Vornado.

In sum, Vornado has not shown that Interstate's Schedule 13D filings or its proxy statement contain any material omissions or misrepresentations. There is no danger that Vornado's shareholders will be misled, and consequently no harm will come to Vornado by the denial of an injunction. Accordingly, its motion for a preliminary injunction restraining Interstate from soliciting or voting proxies must be denied.

It is so ordered.

---

1. The sole claim of expertise in Interstate's proxy statement appears at page 12:

"Interstate develops, owns and operates strip and regional type shopping centers, anchored by discount department and conventional department stores, in various states. Interstate considers itself an expert in shopping center and real estate matters."

Vornado does not contest that Interstate is an expert in "shopping center and real estate matters."